UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TYRONE ANTHONY BELL #240434

                    Plaintiff,                    Case No. 4:21-cv-10399;
VS                                                Case No. 21-cv-10705
                                                  Hon. Shalina D. Kumar
                                                  Mag. Elizabeth A. Stafford

HEIDI WASHINGTON, et, al.

                    Defendants,                   F I L E D
_____/                 APR 17 2023

            MOTION FOR RECONSIDERATION            CLERK'S OFFICE
                                                  DETROIT

   Tyrone-Anthony: Bell, pro se litigant, plaintiff moves this Honorable Court to

grant this Motion for Reconsideration, pursuant to Fed.R.Civ.P. 59(e) for the

following:

   1.] The court did not consider the attached affidavits. Florist's Transwold

Delivery Inc v Fleurop-Interflora 261 FSupp2d 837, 842 (E.D. Mich 2003)

   2.] The Court has not considered the fact that Plaintiff Bell had lost complete

control of his litigation due to the court denial of his injunctive relief

request. See Shuffle Tech Int'l LLC v Sci Games Corp 2017 US Dist Lexis 141445

at *27-8(N.D. Ill 2007)

   3.] The District court improperly made credibility determination and failed to

accord his allegations the presumption of truth in finding that the defendants

had not subjectively disregarded the risk presented to him by COVID-19. Anderson

v Liberty Lobby Inc 477 US 242, 255 (1986)

   4.] The Court did not properly consider the subjective prong of deliberate

indifference. Multiple defendants purposefully placed Willis and Roper highly

infectious inmates within feet of Plaintiff causing the Plaintiff's infection.

See Brooks v Washington No. 21-2639; 2022 U.S. App Lexis 8451 at *5-7 (6th Cir

2022)

   5.] The Court has made a clear error in law were it found that Plaintiff has

-1-

POOR QUALITY ORIGINAL

not stated a claim.

Although the Federal Rule of Civil Procedure does not provide for a motion for reconsideration, such motions, if served within 10 days of the entry of judgment, are considered motions to alter or amend judgment pursuant to Fed.R.Civ.P. 59(e); Nagle Industries Inc v Ford Motor Co 175 FRD 251, 253 (E.D. Mich May 21, 1997). Such motions for reconsideration "are entrusted to the Court's sound discretion," and may generally be granted for three reasons: (i) an intervening change of law; (ii) evidence not previously available has become available; or (iii) the necessity to correct a clear error of law or prevent manifest injustice. Id at 254

### Standard of Review

The standard of appellate review for motion to dismiss pursuant to Rule 12(b)(6) is de novo, and the Court will employ the same standard as the district court. First Am Title Co v Devaugh 480 F3d 438, 443 (6th Cir 2007); Nat'l Hockey League Players Assn v Plymouth Whalers Hockey Club 419 F3d 462, 468 (6th Cir 2005)

All factual allegations in the complaint must be presumed to be true and reasonable inferences must be made in favor of the non-moving party. Great Lake Steel v Deggendorf 716 F2d 1101, 1105 (6th Cir 1983)

### Discussion

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. RMI Titanium Co v Westinghouse Elec Corp. 78 F3d 1125, 1134 (6th Cir 1996). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of cause of action...."

Bell Atlantic Corp v Twombly 550 US 544, 555 (2007). As the Supreme Court
provided in Iqbal and Twombly, "[t]o survive a motion to dismiss, a complaint
must contain sufficient factual matter, accepted as true, to 'state a claim to
relief that is plausible on its face." citing Twombly 550 US at 556. The
plausibility standard does not impose a probability requirement at the pleading
stage; it simply calls for enough facts to raise a reasonable expectation that
discovery will reveal evidence of illegal [conduct]." Twombly 550 US at 556.

Since Estelle v Gamble the U.S. Supreme Court has held:

> "The handwritten pro se document is to be liberally construed. As the
> Court held in Haines v Kerner 404 US 519 (1972), a pro se complaint,
> 'however inartfully pleaded,' must be held to 'less stringent
> standards than formal pleadings drafted by lawyers' and can only be
> dismissed for failure to state a claim if it appears 'beyond doubt
> that the plaintiff can prove not set of facts in support of his claim

429 US 97, 106 (1976)

Defendant Washington is the director of the Michigan Department of Corrections
(MDOC), final decision maker and is made aware of all transfers that were COVID-
19 related. Defendant Washington was made aware that there were staff at Saginaw
Correctional Facility (SRF) that were not following, and enforcing the COVID-19
Risk Reduction Protocols after Sept. 17, 2010 when Plaintiff filed a complaint
which was directed to not only Defendant Washington but also to Governor Whitmer
and Defendant Winn. The complaint provided exact times and dates of MDOC staff
Risk Reduction Protocols violations. If these actions were corrected the actions
that lead to Plaintiff's infection would not have occured. See paragraph #41 of
Complaint. During November of 2020 two inmates Mario Willis and DeWanye Roper
tested positive for COVID-19. Willis and Roper were informed by medical
personnel that they were positive for the novel coronavirus and would be
transferred to Carson City Correctional Facility (DRF) for quarantine purposes.
The standing Risk Reduction Protocols was "14-day" quarantine. Neither Willis
nor Roper remained at DRF for "14-day". The transfer log will sustain that the

-3-

infectious inmates were not placed under proper quarantine. Before any inmate is transferred to a facility, they were to be tested for COVID-19. Mr. Willis and Mr. Roper had already tested positive for COVID-19. Prior to returning to SRF Mr. Willis and Mr. Roper must both test negative for COVID-19.

Defendant Winn approved the transfer of Willis and Roper from/to SRF. Because Defendants: Winn, Dr. Oliver, Cheri Crawley, Carol Gross, Geron Johnson, Curtina Jones, Jolene Kanyo, Barbara Kopka, Kathleen Leffingwell, Susan McaCalley, Melynda Reuther, Susan Smith, Samatha Stack and Kathy Unknown were aware of Willis and Roper testing positive for COVID-19 which lead to their transfer to DRF. They all had a standing duty to protect Plaintiff. Defendants: Winn, Dr. Oliver, Cheri Crawley, Carol Gross, Geron Johnson, Curtina Jones, Jolene Kanyo, Barbara Kopka, Kathleen Leffingwell, Susan McaCalley, Melynda Reuther, Susan Smith, Samatha Stack, Kathy Unknown, R. Morgan, C. Walker, J. Anderson, J. Bischer, and M. Chalker, allowed both Willis and Roper to be housed in general population with Mr. Bell. Within days of Willis and Roper placement in 700 unit one of the infected was mere cells from Plaintiff, Plaintiff contracted the novel coronavirus. These action shows that defendants: Winn, Dr. Oliver, Cheri Crawley, Carol Gross, Geron Johnson, Curtina Jones, Jolene Kanyo, Barbara Kopka, Kathleen Leffingwell, Susan McaCalley, Melynda Reuther, Susan Smith, Samatha Stack and Kathy Unknown were the proximate cause of Plaintiff's COVID-19 infection where they were aware of Willis and Roper testing positive for COVID-19 which lead to their transfer to DRF. They all had a standing duty to protect Plaintiff. Defendants: Winn, Dr. Oliver, Cheri Crawley, Carol Gross, Geron Johnson, Curtina Jones, Jolene Kanyo, Barbara Kopka, Kathleen Leffingwell, Susan McaCalley, Melynda Reuther, Susan Smith, Samatha Stack, Kathy Unknown, R. Morgan, C. Walker, J. Anderson, J. Bischer, and M. Chalker had personal involvement in causing Plaintiff to contract the novel coronavirus, they were

-4-

the proximate cause of Plaintiff's COVID-19 infection.

Plaintiff's complaint was wrongfully denied under 28 USC 1915(e)(2). The
verified complaint "contain sufficient factual matter, accepted as true, to
state a claim to relief that is plausible on its fact." The complaint show an
Eight Amendment violation of cruel and unusual punishment. In <u>Estelle v Gamble</u>
Justice Stewart, Powell and Stevens are quoted as stating:

> "It suffices to note that the primary concern of the drafters was to
> proscribe 'torture[s]' and other 'barber[ous] methods of punishment."

97 SCt 285, 290 (1976) The Supreme has also held:

> "[I]t is safe to affirm that punishment of torture...and all others in
> the same line of unnecessary cruelty, are forbidden by the amendment,
> quoting <u>Wilkerson v Utah</u> 99 US 130, 136 (1879), "Punishments are cruel
> when they involve torture or a lingering death..." quoting <u>In re
> Kemmler</u> 136 US 436, 447 (1890)

Id.

The actions reported in the complaint raise a deliberate indifference issue.
And can be proven by tangible evidence (i.e. security surveillance footage,
transfer logs, affidavits of witnesses). All staff are obligated to ensure the
safety of inmates. PD 03.03.130 (K) states:

> "Staff have a responsibility to protect the lives of ...prisoners...The
> following are prohibited:
> 1. Corporal punishment
> 3. Any act or lack of care, whether by willful act or neglect, that injures
> of significantly impairs the health of any prisoner."

Defendants: Winn, Dr. Oliver, Cheri Crawley, Carol Gross, Geron Johnson,
Curtina Jones, Jolene Kanyo, Barbara Kopka, Kathleen Leffingwell, Susan
McaCalley, Melynda Reuther, Susan Smith, Samatha Stack and Kathy Unknown were
aware of Willis and Roper testing positive for COVID-19 which lead to their
transfer to DRF. They all had a standing duty to protect Plaintiff. Defendants:
Winn, Dr. Oliver, Cheri Crawley, Carol Gross, Geron Johnson, Curtina Jones,
Jolene Kanyo, Barbara Kopka, Kathleen Leffingwell, Susan McaCalley, Melynda
Reuther, Susan Smith, Samatha Stack, Kathy Unknown, R. Morgan, C. Walker, J.

Anderson, J. Bischer, and M. Chalker, allowed Willis and Roper to be placed in
the housing unit while Mr. Willis and Roper were still infectious defendants:
Winn, Dr. Oliver, Cheri Crawley, Carol Gross, Geron Johnson, Curtina Jones,
Jolene Kanyo, Barbara Kopka, Kathleen Leffingwell, Susan McaCalley, Melynda
Reuther, Susan Smith, Samatha Stack and Kathy Unknown were aware of Willis and
Roper testing positive for COVID-19 they failure to follow, and enforce COVID-
19 Risk Reduction Protocols lead to Plaintiff's COVID-19 infection. They all had
a standing duty to protect the non-infected inmates (which includes Plaintiff)
at SRF. Defendants: Winn, Dr. Oliver, Cheri Crawley, Carol Gross, Geron Johnson,
Curtina Jones, Jolene Kanyo, Barbara Kopka, Kathleen Leffingwell, Susan
McaCalley, Melynda Reuther, Susan Smith, Samatha Stack, Kathy Unknown, R.
Morgan, C. Walker, J. Anderson, J. Bischer, and M. Chalker, action constitutes
deliberate indifference. In Estelle v Gamble the Court held:

> "An inmates must rely on prison authorities to treat his medical
> needs; if the authorities fail to do so, those needs will not be met.
> In the worst cases, such a failure may actually produce physical
> 'torture or a lingering death.'" quoting In re Kemmler Id.

> "The infliction of such unnecessary suffering is inconsistent with
> contemporary standards of decency as manifested in modern
> legislation."

429 US 97, 103

When Defendants Washington, Minard and Winn allowed the transfer of infectious
inmates from DRF to SRF their action were done knowingly and intentionally
causing the infection of Plaintiff. When defenants: Minard, Morgan, Walker, J.
Anderson, Bischer, Chalker, Oliver, Crawley, Gross, Johnson, Jones, Kanyo,
Kopka, Leffingwell, McCalley, Reuther, Smith, Stack and Kathy Unknown allowed
Willis and Roper to be placed in general population which lead to Plaintiff's
COVID-19 infection their personal actions constitutes deliberate indifference
and cruel and unusual punishment.

Defendant Washington was fully aware of the severity of the effects from

contracting COVID-19 prior to allowing Willis and Roper to be transferred back to SRF. See Verified Complaint paragraphs #36, 37, 42, 44, 49, 65, 87, 93.

Defendant Washington had outlined what should occur in order to protect the health and safety of inmates and staff alike. See Verified Complaint paragraphs #22, 23, 28, 29, 30, 31, 32.

There was Risk Reduction Protocols issued to prevent the spread of COVID-19, see Verified Complaint paragraphs #22, 26, 30, 33, 39, 40[1]

Although the Risk Reduction Protocols appear to be a perfect way of offering proper medical responses. It was not practices, followed, enforced or corrected by supervisors which lead to the outbreaks at SRF and Plaintiff's COVID-19 infection, see Verified Complaint paragraphs #24, 25, 29, 41, 46-8, 50-6, 59-61. The affidavits of Brandon Johnson #513958 paragraphs #1, which states:

> "I am a prisoner who was transferred ...with 100 prisoners...that led to exposure(s) to the COVID-19 virus. Over 80 ... prisoners became infected, a number of prisoners were hospitalized, and more than one prisoner died."

> "we seem to have been intentionally-infected with the covid virus."

> 21. "Each of our lives, were put at risk of infection by prison officials and satff, there has not been any improvements in care..."

> 23. "We were simply waiting to be infected, or waiting to die as a result of Michigan's deliberate indifference(s) and reckless disregard for human life."

Ronald Morrell #955782 had a similar experience

Even after the outbreak there was still disregard for the safety and health of inmates by staff, see Verified Complaint paragraphs #88-9. Plaintiff complained for days about breathing complication before he was properly treated, see Verified Complaint paragraphs #92, 95, 99 and 100

Staff openly displayed their disregard for inmates safety and health when C.O. Floye stated, "just don't give a fuck." "they just can't wait until everyone has been sick so that they can get this over with." paragraph #96. The number of

times that staff were not following Risk Reduction Protocols are too numerous to ignore, see Verified Complaint paragraphs # 97, 105, 108-11. Paragraph 105 can show that staff were purposely attempting to infect Plaintiff.

Plaintiff has displayed where defendants were directly (personally) involved with the cause of Plaintiff's COVID-19 infection. See Verified Complaint paragraphs # 118-19, 121, 124, 126, 133, 135-8, 140-44, 147-50, 174-84, 190, and 192

## Standard of Review

This court uses a de novo standards when reviewing a district court's dismissal of a complaint pursuant to Rule 12(b)(6). Scott v Ambani 557 F3d 642, 646 (6th Cir 2009)

## Discussion

A prisoner has adequately stated a cause of action "when he alleges that prison authorities have denied reasonable requests for medical treatment in face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury." Scott v Ambani Id at 648

Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to plaintiff's health and safety. Owensby v City of Cincinnati 414 F3d 596, 603 (6th Cir 2005). Defendants: Washington, Winn, Dr. Oliver, Cheri Crawley, Carol Gross, Geron Johnson, Curtina Jones, Jolene Kanyo, Barbara Kopka, Kathleen Leffingwell, Susan McaCalley, Melynda Reuther, Susan Smith, Samatha Stack and Kathy Unknown were aware of Willis and Roper testing positive for COVID-19 which lead to their transfer to DRF. They all had a standing duty to protect Plaintiff during the pandemic. Defendants: Winn, Dr. Oliver, Cheri Crawley, Carol Gross, Geron Johnson, Curtina Jones, Jolene Kanyo, Barbara Kopka, Kathleen Leffingwell, Susan McaCalley, Melynda Reuther, Susan Smith, Samatha Stack, Kathy Unknown, R. Morgan, C. Walker, J.

-8-

Anderson, J. Bischer, and M. Chalker, knew of the dangers of COVID-19 and disregarded a substantial risk of serious harm to Plaintiff's health and safety when they either allowed Willis and Roper to be transferred from DRF to SRF and/or allowed Willis and Roper to be placed in general population while still highly infectious causing Plaintiff's COVID-19 infection. A claim has facial plausibility when the plaintiff pleas factual content that allows the court to draw the reasonable inference that the defendant is laible for the misconduct. Aschroft v Iqbal 566 US 662, 678 (2009). U.S. Justices Souter, Stevens, Ginburg, and Breyer in their dissent held:

> "that a prison official acts with 'deliberate indifference' if 'the official acted or failed to act despite his knowledge of a substantial risk or serious harms.")

Ashcroft Id. at 691. It goes beyond debate that all defendants knew of the dangerous of contracting COVID-19. It was a global pandemic that was broadcasted daily on the new, in newspaper, on radio, and every major blog. In Wilson v Williams, the honorable Justice James S. Gwin states:

> "State government and the media have well documented the spread of COVID-19 and the efforts to contain the virus and limits its impact. The virus's highly-infectious nature and the risk it poses, especially to medically vulnerable poplulations, has led to the implementation of unprecedented measures throughout the country and the world."

> "For inmates in our country's prisons the virus is no less a threat, but distancing measures are only minimally available."

455 F.Supp 3d 467, 470-71(6th Cir 2020)

MDOC staff was as aware due to the numerous MDOC memorandums and executive orders. There were permanent signs placed throughout the MDOC. Supervisory liability is applicable here because all supervisors were aware of the COVID-19 risk reduction protocol violations either through Plaintiff's Sept 17, 2020 complaint or personal observation. There are administrators windows that have clear unobstructed views of general population which allows daily observation of staff not practice, following and enforcing the Risk Reductional Protocols.

-9-

Their acquiescence lead to the failure that caused Plaintiff to become infected with COVID-19 and the outbreaks within the MDOC that lead to numerous hospitalizations and death. See Ashcoft Id at 693. see Zakora v Chrisman (In re Estate of Zakora) 44 4th 452, 475 (6th Cir 2022)("a supervisor may be liable if he/she "abandons the specific duties of his [her] position in the face of actual knowledge of a breakdown in proper workings of the department." Winkler v Madison County 893 F3d 877, 898 (6th Cir 2018). The supervisor must be abdicated his/her responsibility and the "active performance of the [supervisor's] individual justification" must have directly resulted in the constitutional injury. Gregory v City of Lousiville 444 F3d 725, 752 (6th Cir 2006) "The supervision need not have known of the 'substantial risk to the injuried party but rather must have possessed knowledge of potential danger to a particular class of persons." Troutman v Louisville Metro Dept of Corr 979 F3d 472, 488 (6th Cir 2020)

When Defendants: Washington, Winn, Minard, Chalker, M. Anderson Bischer and Chalker were made aware that staff were not practicing, following and enforcing the COVID-19 risk reduction protocols they 'abandon[ed] the specific duties of his [her] position in the face of actual knowledge of a breakdown in proper working of the department." Winkler Id.

U.S. Justice Souter, Stevens, Ginsburg and Breyer state in Aschoft "[w]e made it clear, ...that court must take the allegations as true, no matter how skeptical the court may be...a plaintiff must 'allege facts' that taken as true are 'suggestive of illegal conduct.'"Ashcroft Id at 696

The Michigan Supreme Court has determined that in order to be the proximate cause of the injury or damage, a defendant's conduct must be 'the one most immediate, efficient, and direct cause preceding an injury." Domingueza v Corr. Med. Servs 555 F3d 543, 552 (6th Cir 2009). In the case at bar, defendants

-10-

Washington and Minard had to authorize the transfer which initiated the chain of events which caused Plaintiff's COVID-19 infection. After Willis and Roper were transferred to SRF from DRF the hub for COVID-19 positive inmates, defendants Minard, Morgan, Walker, J. Anderson, Bischer, Chalker, Oliver, Crawley, Gross, Johnson, Jones, Kanyo, Kopka, Leffingwell, McCalley, Reuther, Smith, Stack, and Kathy Unknown allowed Willis and Roper to avoid proper quarantine and be placed in general population. Willis and Roper were placed in the same housing unit as Plaintiff, days later Plaintiff was COVID-19 positive. The actions of defendants: Washington, Winn, Minard, Morgan, Walker, Dr. Oliver, Crawley, Gross, Johnson, Jones, Kanyo, Kopka, Leffingwell, McCalley, Reuther, Smith, Stack, Kath Unknown, Chalker, and Bischer was the proximate cause of Plaintiff's COVID-19 infection. The concept of "deliberate indifference" encompasses both a subjective and an objective component. The objective component requires that the deprivation alleged be "sufficiently seriuos". Farmer 511 US 825, 834 (1994). Thus, "for a claim ... based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. The objective component has been satisfied because the defendants action display an intentional desire to expose plaintiff to COVID-19. Wilson v Williams 961 F3d 829, 840 (6th Cir 2020)(Judge Gibbons' opinion "easily satisfied")

To satisfy the subjective component plaintiff must show that the prison officials had "a sufficiently culpable state of mind." Curry v Scott 249 F3d 493, 506 (6th Cir 2001), A "sufficiently culpable state of mind" is one in which "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. A prison official can be liable if he "disregards that risk by failing to take reasonable measures to abate it."Id

-11-

To prove a defendant's subjective knowledge "[a] plaintiff may rely on circumstantial evidence...: A jury is entitled to conclude that a prison official knew of a substantial risk from very fact that the risk was obvious." Rhinehart v Scutt 894 F3d 721, 738 (6th Cir 2018). In the case at bar, Defendants: Minard, Morgan, Walker, J. Anderson, Bischer, Chalker, Oliver, Crawley, Gross, Johnson, Jones, Kanyo, Kopka, Leffingwell, McCalley, Reuther, Smith, Stack and Kathy Unknown allowed highly infectious inmates Willis and Roper to be placed in general population with Plaintiff after Willis and Roper had a positsive COVID-19 test within 10 days and did not have a negative test results which caused Plaintiff to contract the novel coronavirus. Defendants: Washington, Winn, Minard, Morgan, Walker, J. Anderson, Bischer, Chalker, Oliver, Crawley, Gross, Johnson, Jones, Kanyo, Kopka, Leffingwell, McCalley, Reuther, Smith, Stack and Kathy Unknown knew of the substantial risk to Plaintiff's health and safety and disregarded it with their actions of placing Willis and Roper in general population. The subjective component is satisfied. Justice McDonald in her opinion states:

> "Furthermore, 'actual knowledge' does not require that a prison official know a prisoner would with certainty, be harmed, or that a particular prisoner would be harmed in a certain way. 'An Eighth Amendment claim need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act depsite his knowledge of a substantial risk of serious harm." quoting Farmer v Brennan 511 US at 842

Curry v Scott 249 F3d 493, 507 (6th Cir 2001)

### Monell Claim

In Monell the Supreme Court held that municipalities can be sued directly under § 1983 where the action of the municipality itself can be said to have caused the harm, as when 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Id at 690. Once Defendant

Washington and Minard were made aware that staff were not practicing, following and enforcing the Risk Reduction Protocols it became obvious aware to Defendants Washington and Minard that their staff need additional training about the seriousness of contracting and spreading COVID-19. Staffs behavior was not an isolated incident but, rather, emblematic of a consistent and pervasive pattern of defiance. See Berry v City of Detroit 25 F3d 1342, 1346 (6th Cir 1994); see also Hill v McIntyre 884 F2d 271, 275(6th Cir 1989)("To establish liability under a failure to train theory, 'the plaintiff must prove: that the training program is inadequate to the tasks that that officers must perform; that the inadequacy is the result of the [] deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury.") The affidavits presented to the Court from Morrell, and Johnson support that Defendant Washington did not provide proper and adequate training to her MDOC staff. Or either was acquiesce/implicit in their violations.

Plaintiff has show that Defendants Washington and Minard encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct." Taylor v Michigan Dep't of Corr. 69 F3d 76, 81 (6th Cir 1995). Plaintiff is entitled to relief under the Eighth Amendment when they proved proof of mingling of inmates with serious contagious diseases with other prison inmates. Helling v McKinney 509 US 25,34 (1993) In the Helling dissent Justice Thomas states:

> "The Eighth Amendment provides that 'excessive bail shall not be required nor excessive fines, imposed, nor cruel and unusual punishment inflicted." The Court holds that a prisoner states a cause of action under the Cruel and Unusual Punishment Clause by alleging that prison officials, with deliberate indifference, have exposed him to an unreasonable risk of harm.

The actions show that Plaintiff was intentionally exposed to COVID-19 when

infectious inmates Willis and Roper were authorized to be placed in general population who were diseased, highly infectious inmates which caused Plaintiff to contract COVID-19.

### THE DENIAL OF MR. BELL'S REQUEST FOR INJUNCTIVE RELIEF IMPEDED MR. BELL'S ABILITY TO ACCESS THE COURTS

The Constitution guarantees prisoner the right to petition the government to redress of greievance. This right to access the imposes an affirmative duty on prison officials to help an inmate prepare and file legal papers. This includes challenges to condition of confinement. <u>Bounds v Smith</u> 430 US 817, 823 (1977); <u>Lewis v Casey</u> 518 US 343, 351-55(1996).

In the case at bar, when the District Court denied Plaintiff's injunctive relief at the same time the District Court was unconsciously removing Plaintiff's ability to control his litigation. Without the injunctive relief Plaintiff could not personally mail his pleadings, Without the injunctive relief plaintiff could not personally produce the legal document to be mailed to the court. Due to the denial of the injunctive relief Plaintiff was unable to personally exercise his First Amendment right. Because plaintiff is classified by the MDOC as a member of a security threat group (STG) Plaintiff is unable to send out electronic mail via Jpay. Plaintiff had to ask another inmate who is not legally trained to send his legal pleadings to his mother. In order for his mother to process the legal documents so that she could personally send the documents to the adverse parties. And deliver the documents to the court. This process had many faults the first and most important being is that Plaintiff was no longer in control of anything. The second is that jpey was not processing all of the mail being sent. The third is that Plaintiff's mother is also not legally trained. She at many times was confused at what she needed to do and how to do it. This is why she had not filed the amended complaint timely. The security surveillance videos in the Eastern District Courthouse will support that Mrs''

Bell on numerous occasions had appeared more than once on the same day due to her forgetting to bring items (documents) to the court house for filing. Had the Eastern District Court granted Mr. Bell's request for injunctive relief Mr. Bell would have remained in control of his litigation and would have not missed any filing deadlines.

Now that because the court did not grant the injunctive relief Mr. Bell has suffered an actual injury, where the court wishes to dismiss the complaint. See Tanner v Yukins 776 F3d 434 (6th Cir 2015)

## Conclusion

Because Plaintiff has detail the personal involvement of defendants. Plaintiff has stated a claim of deliberate indifference constituting cruel and unusual punishment under the Eighth Amendment. Plaintiff ask that the court closely considers that affidavits of Johnson 513958 and Morrell 955782 which show that the blantant disregard for inmates safety and health was not isolated. In fact, the blantant disregard occurred at multiple institution which leads plaintiff to conclude that Defendant Washington intended to spread the novel coronavirus amongst inmates, or at least failed to adequately address the severity to all MDOC staff.

## Relief Requested

Wherefore, Plaintiff has clearly raised a claim where relief can be found. Plaintiff ask that this honorable court recognizes its plain error and reactivate the civil allowing discovery and then proceed to trial, and grant the injunctive relief so that no other impediment to Plaintiff's ability to access the court and control his litigation.

## VERIFICATION

I, Tyrone-Anthony: Bell, party-in-interest, declare (swear, certify, verify or state) that the aforementioned is true and correct under the penalty of perjury

-15-

pursuant to 28 USC § 1746.

Date: 4/__/2023

Respectfully Submitted,

_Tyrone-Anthony Bell_
Tyrone-Anthony; Bell, In Pro Per
MDOC No. 240434
Lapeer Correctional Facility
3225 John Conley Dr''
Lapeer, Michigan 48446

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHER DIVISION

TYRONE ANTHONY BELL #240434

                    Plaintiff,                              Case No. 4:21-cv-10399
                                                            Case No. 21-cv-10705
vs                                                          Hon. Shalina D. Kumar
                                                            Mag. Elizabeth A. Stafford
HEIDI WASHINGTON, et. al.

                    Defandants,
_____/

State of Michigan  )
                   )ss
County of Muskegon )

### AFFIDAVIT OF RONALD MORRELL #955782

I, Ronald Morrell #955782, declare under the penalty of perjury that this
Affidavit has been examined by me and that its contents are true to the best of
my information, knowledge and belief, pursuant to 28 USC 1764; MCR
1.109(D)(3)(b)

1.] I am a prisoner who was transferred from R.A. Handlon Correctional
Facility (MTU) with 100 other prisoners were involved in a irregular. And
otherwise highly unusual prison transfer that led to exposure(s) to the COVID-
19 virus. Over 60 of the transferred prisoners became infected, a number of
prisoners were hospitalized, and more than one prisoner died.

2.] On or about the last 2 weeks of October 2020 adminstrators at MTU in
conjunction with administrators at Lansing decided to tranform unit B into a
COVID-positive quarantine, because unit B has toilets in each cell, and a few
COVID-19 cases were discovered at the facility, which had remained COVID-19 free
during the entire pandemic. Due to pro-active prisoner's vigilance, as none of
us wanted to become infected and forced to wait to die.

3.] This highly contagious infection was introduced to MTU due to prison
staff, and transfers that the Michigan Department of Corrections (MDOC) were

-1-

lying to the public about. We were continually waking up to new faces. And clearly visible "sick" members of prison staff still allowed to work. However, when prisoners would comment on clear signs that staff members were sick, or commented about staff not wearing protective masks. Prisoners were either threatened with disciplinary infractions, or staff would go into their cells and destroy prisoners belongings under the false pretenses of a "routine search."

4. Before the transfer, MTU had been under COVID-19 ready restriction(s) which limited activities, movement and contact with any prisoners outside the unit. Additionally, for numerous weeks each prisoner had to get temperature checks, and make sure no "visible" signs of being sick were found, although these mandatory requirements were not followed by the prison staff, these measures were enforced before we could go eat. Failure(s) to comply with restrictions would result in immediate placement in segregation.

5.] Several days before MTU was going to "clear-out" unit B, all prisoners were given more than one COVID-19 test to be considered and involved in the transfer, each prisoner was "required" to test negative at more than one testing could not have any "visible" signs of COVID-19 and still had to pass a temperature check on the way out.

6.] Although most of us were severally concerned about such a highly irregular transfer that did not even come close to standard MDOC procedure(s), the substantial measures being taken to ensure that <u>only</u> prisoners who were without doubt covid-negative, were being transferred was our <u>only</u> comfort. The measures were so stringent, even before being allowed to board our buses, we were made to throw our old covid-masks into the garbage, and we were each given a brand new mask. There was a small amount of comforts found in that alone, although any comfort(s) was short lived.

7.] Upon arrival at the new facility Muskegon Correctional Facility-MCF, the

-2-

first thing I and other prisoners noticed were signs saying it was a covid-positive unit. We were informed that the signs were left over from a massive covid-outbreak, at MCF. And that our unit had been cleaned and was "safe".

8.) We were again, re-tested, and every single prisoner tested "negative".

9.) However, after our arrival at the new facility, we were not allowed anytime on the yard, we weren't even allowed to use recreation rooms (dayrooms) in our own unit. Those of use who transferred together were the only prisoners at that time being housed in the unit so there were no risk of outside contact. With the exception of staff.

10.) Essentially, we were crowded into hallways which made any efforts of social-distancing next to impossible.

11.) Prisoners were restless and worried because we were no longer able to protect ourselves. Additionally, every prisoner involved in the highly irregular, mass-transfer was forced to go approximately four days without a shower, without clean clothes (including clean underwear) causing the stink and filth to be overwhelming. The new facility (MCF) blamed the old facility (MTU) for failing to inform them that all prisoners had been lockdown for two days without showers or personal property before the transfer, so the new facility did not even care about our property that was both necessary and essential to maintain proper hygiene.

12.) Such deliberate indifference to our basic health needs caused prisoners to stand together, simply to request our property. Dirty underwear can cause chaffing and skin-irritation(s), especially without a shower. Maintaining hygiene is a basic human right.

13.) The men who "voiced" concerns to staff about our property so that we could merely take a shower and put on clean clothes were handcuffed, taken to segregation, and charged with inciting a riot, although no "rioting" ever

-3-

truthfully occured.

14.j Yet, once our property was returned, there was an extremely long wait for a shower, and prisoners were satisfied. We as a whole only wanted to get clean, and put on clean clothes.

15.j It is "critical" to note, none of the men removed from the building shortly after our arrival, were ever found to test "positive" for the covid virus. This indicates the only reasonable point of contact for the infection being the building itself and/or the prison staff assigned to our building.

16.j The covid-19 infection is said to be transmitted by surface contact, and the virus is airborne.

17.j Therefore, in order to properly clean a building to reasonable prevent spread of such a highly-contagious infection that is spread by surface contact and breathing. A building would not only have to have every surface properly cleaned and sanitied. But the building would also have to be well-ventilated, otherwise once a surface was cleaned, it would/could be re-contaminated by the airborne particles.

18.j After the first week, 21 prisoners tested positive for the covid virus, and were immediately taken to a different unit for single-man-room segregation. Yet before these positive test results men were still confined to hallways, restricting any reasonable chance of social distancing. A week later, over 70 prisoners tested "positive" for covid-19. As a result, the first 21 prisoners were returned to the unit, and it was again designated a covid-positive unit.

19.j As it turns out the unit itself was not properly cleaned before our arrival and asking staff about proper ventilation seemed to inspire utter confusion, and disbelief. Like nobody could understand the extreme importance of properly ventilating a building that had been infected with an airborne virus causing a global pandemic. Additionally several staff members admitted the

-4-

building was not properly cleaned because we were transferred too early, while other information claims that "covid-positive" prisoners were removed shortly before the first transfer arrived.

20.) which means, as a result of egregious deliberate indifference by prison officials/staff, and a clear disregard for the health, well-being and lives of all prisoners protected under the Eighth Amendment of the Constitution of the United States, we seem to have been intentionally-infected with the covid virus.

21.) Each of our lives, were put at risk of infection by prison officials and staff, there has not been any improvments in care, nor added resources for prisoner safety, So where are the emergency funds going?

22.) It is entirely unreasonable to even think a highly contagious infection can be controlled while MDOC continues to shuffle prisoners around the state, through different facilities and even shuffled throughout different units. Even the state Governor is ordering "stay-at-home" urging people to limit the contact with others, as more contact increases risk. Yet, it seems like MDOC deliberately continues to move people around to promote possible spreading of the virus.

23.) We were simply waiting to be infected, or waiting to die as a result of Michigan's deliberate indifference(s) and reckless disregard for human life.

I, Ronald Morrell #955782, declare (swear, cerifty, or verify) that the foregoing is true and correct to the best of my knowledge and belief pursuant to 28 USC 1746.

Respectfully Submitted,

Ronald Morrell #955782
Declarant

Date: 9-30-22

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHER DIVISION

TYRONE ANTHONY BELL #240434

                Plaintiff,

vs

HEIDI WASHINGTON, et. al.

                Defendants,

Case No. 4:21-cv-10399
Case No. 21-cv-10705
Hon. Shalina D. Kumar
Mag. Elizabeth A. Stafford

State of Michigan  )
               )ss
County of Muskegon )

## AFFIDAVIT OF BRANDON JOHNSON#513958

I, Bradon Johnson #513958, declare under the penalty of perjury that this Affidavit has been examined by me and that its contents are true to the best of my information, knowledge and belief, pursuant to 28 USC 1764; MCR 1.109(D)(3)(b)

1.] I am a prisoner who was transferred from R.A. Handlon Correctional Facility (MIU) with 100 other prisoners were involved in a irregular. And otherwise highly unusual prison transfer that led to exposure(s) to the COVID-19 virus. Over 80 of the transferred prisoners became infected, a number of prisoners were hospitalized, and more than one prisoner died.

2.] On or about the last 2 weeks of October 2020 adminstrators at MIU in conjunction with administrators at Lansing decided to tranform unit B into a COVID-positive quarantine, because unit B has toilets in each cell, and a few COVID-19 cases were discovered at the facility, which had remained COVID-19 free during the entire pandemic. Due to pro-active prisoner's vigilance, as none of us wanted to become infected and forced to wait to die.

3.] This highly contagious infection was introduced to MIU due to prison staff, and transfers that the Michigan Department of Corrections (MDOC) were

lying to the public about. We were continually waking up to new faces. And clearly visible "sick" members of prison staff still allowed to work. However, when prisoners would comment on clear signs that staff members were sick, or commented about staff not wearing protective masks. Prisoners were either threatened with disciplinary infractions, or staff would go into their cells and destroy prisoners belongings under the false pretenses of a "routine search."

4. Before the transfer, MTU had been under COVID-19 ready restriction(s) which limited activities, movement and contact with any prisoners outside the unit. Additionally, for numerous weeks each prisoner had to get temperature checks, and make sure no "visible" signs of being sick were found, although these mandatory requirements were not followed by the prison staff, these measures were enforced before we could go eat. Failure(s) to comply with restrictions would result in immediate placement in segregation.

5.] Several days before MTU was going to "clear-out" unit B, all prisoners were given more than one COVID-19 test to be considered and involved in the transfer, each prisoner was "required" to test negative at more than one testing could not have any "visible" signs of COVID-19 and still had to pass a temperature check on the way out.

6.] Although most of us were severally concerned about such a highly irregular transfer that did not even come close to standard MDOC procedure(s), the substantial measures being taken to ensure that only prisoners who were without doubt covid-negative, were being transferred was our only comfort. The measures were so stringent, even before being allowed to board our buses, we were made to throw our old covid-masks into the garbage, and we were each given a brand new mask. There was a small amount of comforts found in that alone, although any confort(s) was short lived.

7.] Upon arrival at the new facility Muskegon Correctional Facility-MCF, the

first thing I and other prisoners noticed were signs saying it was a covid-positive unit. We were informed that the signs were left over from a massive covid-outbreak, at MCF. And that our unit had been cleaned and was "safe".

8.] We were again, re-tested, and every single prisoner tested "negative".

9.] However, after our arrival at the new facility, we were not allowed anytime on the yard, we weren't even allowed to use recreation rooms (dayrooms) in our own unit. Those of use who transferred together were the only prisoners at that time being housed in the unit so there were no risk of outside contact. With the exception of staff.

10.] Essentially, we were crowded into hallways which made any efforts of social-distancing next to impossible.

11.] Prisoners were restless and worried becuase we were no longer able to protect ourselves. Additionally, every prisoner involved in the highly irregular, mass-transfer was forced to go approximately four days without a shower, without clean clothes (including clean underwear) causing the stink and filth to be overwhelming. The new facility (MCF) blamed the old facility (MTU) for failing to inform them that all prisoners had been lockdown for two days without showers or personal property before the transfer, so the new facility did not even care about our property that was both necessary and essential to maintain proper hygiene.

12.] Such deliberate indifference to our basic health needs caused prisoners to stand together, simply to request our property. Dirty underwear can cause chaffing and skin-irritation(s), especially without a shower. Maintaining hygiene is a basic human right.

13.] The men who "voiced" concerns to staff about our property so that we could merely take a shower and put on clean clothes were handcuffed, taken to segregation, and charged with inciting a riot, although no "rioting" ever

truthfully occured.

14.] Yet, once our property was returned, there was an extremely long wait for a shower, and prisoners were satisfied. We as a whole only wanted to get clean; and put on clean clothes.

15.]. It is "critical" to note, none of the men removed from the building shortly after our arrival, were ever found to test "positive" for the covid virus. This indicates the only reasonable point of contact for the infection being the building itself and/or the prison staff assigned to our building.

16.] The covid-19 infection is said to be transmitted by surface contact, and the virus is airborne.

17.] Therefore, in order to properly clean a building to reasonable prevent spread of such a highly-contagious infection that is spread by surface contact and breathing. A building would not only have to have every surface properly cleaned and sanitied. But the building would also have to be well-ventilated, otherwise once a surface was cleaned, it would/could be re-contaminated by the airborne particles.

18.] After the first week, 21 prisoners tested positive for the covid virus, and were immediately taken to a different unit for single-man-room segregation. Yet before these positive test results men were still confined to hallways, restricting any reasonable chance of social distancing. A week later, over 70 prisoners tested "positive" for covid-19. As a result, the first 21 prisoners were returned to the unit, and it was again designated a covid-positive unit.

19.] As it turns out the unit itself was not properly cleaned before our arrival and asking staff about proper ventilation seemed to inspire utter confusion, and disbelief. Like nobody could understand the extreme importance of properly ventilating a building that had been infected with an airborne virus causing a global pandemic. Additionally several staff members admitted the

building was not properly cleaned because we were transferred too early, while other information claims that "covid-positive" prisoners were removed shortly before the first transfer arrived.

20.] Which means, as a result of egregious deliberate indifference by prison officials/staff, and a clear disregard for the health, well-being and lives of all prisoners protected under the Eighth Amendment of the Constitution of the United States, we seem to have been intentionally-infected with the covid virus.

21.] Each of our lives, were put at risk of infection by prison officials and staff, there has not been any improvments in care, nor added resources for prisoner safety, So where are the emergency funds going?

22.] It is entirely unreasonable to even think a highly contagious infection can be controlled while MDOC continues to shuffle prisoners around the state, through different facilities and even shuffled throughout different units. Even the state Governor is ordering "stay-at-home" urging people to limit the contact with others, as more contact increases risk. Yet, it seems like MDOC deliberately continues to move people around to promote possible spreading of the virus.

23.] We were simply waiting to be infected, or waiting to die as a result of Michigan's deliberate indifference(s) and reckless disregard for human life.

I, Brandon Johnson #513958, declare (swear, cerifty, or verify) that the foregoing is true and correct to the best of my knowledge and belief pursuant to 28 USC 1746.

Respectfully Submitted,

Brandon Johnson #513958
Declarant

Date: 9-30-22

One Parole And End Put
MDCC No 240434
% Lapier Correctional Facility
3225 John Conley Drive
Lapeer, Michigan 48446



RECEIVED
APR 17 2023
CLERK'S OFFICE
U.S. DISTRICT COURT

Judge Shalina D. Kumar
United States District Court
Eastern District Of Michigan
Theodore Levin United States Courthouse
231 West Lafayette B
Detroit, Michigan 48226